## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE | ) | |
| | ) | |
| JERONE O'NEAL, | ) | |
| | ) | Bankruptcy No. 08-34846 |
| Debtor. | ) | Chapter 7 |
| ——————————————— | ) | |
| | ) | |
| DIANE HARPER HUNT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary No. 09-00805 |
| | ) | |
| JERONE O'NEAL, | ) | |
| | ) | |
| Debtor-Defendant. | ) | |
| ——————————————— | ) | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER TRIAL

In this Adversary proceeding, Plaintiff-Creditor Diane Harper Hunt ("Hunt") seeks to

deny Debtor-Defendant Jerone O'Neal ("O'Neal") a discharge in his related Chapter 7

bankruptcy case. Hunt objected to O'Neal's discharge under 11 U.S.C. § 727(a)(3) on grounds

that he failed to keep or preserve records (Count I), under 11 U.S.C. § 727(a)(5) on grounds that

O'Neal failed to explain the deficiency of assets to meet his liabilities (Count II), and under 11

U.S.C. § 727(a)(4) on grounds that he knowingly and fraudulently made false oaths and accounts

(Count III). Judgment on Count II was entered in favor of O'Neal after Plaintiff Hunt rested at

trial. Following completion of the trial, the following Findings of Fact and Conclusions of Law

are made and to be entered. Pursuant thereto, judgment will separately be entered in favor of

O'Neal on the remaining Counts.

## JURISDICTION AND VENUE

Subject matter jurisdiction lies under 28 U.S.C. § 1334. This matter is here pursuant to 28 U.S.C. § 157 and is referred here by District Court Operating Procedure 15(a). Venue lies under 28 U.S.C. §§ 1408 and 1409. This Adversary proceeding constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(J).

## FINDINGS OF FACT

In 1997, Jerone O'Neal, a one-time Ford Motor Company assemblyman with an educational background consisting of two years at a junior college studying law enforcement, decided to go into business for himself. He purchased a Riverdale, Illinois music store near his home, and then incorporated the store as "Cookie's Sound Track, Inc.," naming it after his late-wife.

Upon formation of the corporation, Cookies Sound Track ("CST") issued 1,000 shares of stock to O'Neal, its president and sole shareholder, at a par value of $1 per share. O'Neal never received an offer to purchase his stock, nor has he transferred it to anyone.

CST is primarily a music store, selling CDs and tapes, but it has branched out into other areas. Customers can now purchase cellular phones, and O'Neal has installed barber and beautician booths in the rear of the store in an attempt to draw more customers.

CST's business model proved unprofitable. O'Neal initially was forced to pay CST's bills himself and make ends meet by using personal credit cards and cash advances. In 2002, he was able to pay off CST's debt and make up for financial shortfalls by applying money that he won in the Illinois lottery. Still, the business remained unprofitable. To make up for subsequent financial difficulties, O'Neal refinanced his personal residence and the building housing CST. He also

-2-

took out a business loan with Innovative Bank to buy supplies.

In addition to forming and operating CST, O'Neal had real estate investments. He owned his primary residence, a residential rental unit, and a building that housed both CST and an additional rental unit. Unfortunately, O'Neal's real estate ventures also proved financially troubled. The Plaintiff Diane Harper Hunt, a former tenant of O'Neal, initiated a state court lawsuit against O'Neal for violations of the Chicago Landlord and Tenant Act and eventually recovered a judgment against O'Neal in that suit for $28,000. Whatever were the grounds for that suit, she has not claimed here that the debt is nondischargeable under 11 U.S.C. § 523.

On December 19, 2008, O'Neal filed his bankruptcy case under Chapter 7 of the Bankruptcy Code. In his schedules, O'Neal reported assets of $360,000 in real property and $28,425 in personal property. He also reported secured claims of $403,349 and unsecured claims of $75,498. O'Neal classified Hunt's claim on Schedule F as unsecured and nonpriority, in the amount of $28,738. On Schedule I, he listed a gross monthly income of $3,506, not including rental income.

On May 6, 2009, in preparation for a deposition of O'Neal under Rule 2004 Fed. R. Bankr. P., Hunt's counsel served O'Neal with a Request for Production of Documents. On June 6, 2009, in connection with that request, Hunt presented a motion to compel production, and O'Neal subsequently submitted an Affidavit of Completion on July 6, 2009, certifying that he had completed production of the requested documents. On August 26, 2009, O'Neal's Rule 2004 examination took place. After the deposition, on September 23, 2009, O'Neal produced additional documents that related to his financial background. On December 14, 2009, he amended his Statement of Financial Affairs.

-3-

This Adversary proceeding went to trial. When Hunt rested her case, O'Neal orally

moved for a judgment on partial findings under Rule 52(c) Fed. R. Civ. P., made applicable in

this proceeding by Rule 7052 Fed. R. Bankr. P. In that Motion, O'Neal sought in part a judgment

on Count II, which sought denial of discharge under 11 U.S.C. § 727(a)(5) for failure to explain

the deficiency of assets to pay O'Neal's debts. That part of the Motion was granted for reasons

and based on Findings stated from the bench, and judgment on Count II was entered in O'Neal's

favor [Docket No. 31]. The Motion was denied as to other Counts.

In the remaining Counts I and III, Hunt argues that O'Neal failed to provide his creditors

with enough information to ascertain his financial condition, and also contends that O'Neal made

false oaths and accounts. For these reasons, Hunt asserts that O'Neal's discharge should be

denied under 11 U.S.C. § 727(a)(3) and (4).

## I. ADEQUACY OF DOCUMENTS PRODUCED [COUNT I: TITLE 11 U.S.C. § 727(a)(3)]

### A. Information, Books, and Records that O'Neal Supplied

Before O'Neal's Rule 2004 examination, O'Neal produced many but partially incomplete

personal monthly bank statements for the period of May 2007 through June 2009 and monthly

bank statements for CST for the period of May 2007 through June 2009. He also produced CST's

income tax returns from 2006 through 2008, O'Neal's personal income tax returns from 2005

through 2008, evidence of O'Neal's income for the six months prior to filing, valuations of all

three of O'Neal's properties, and a full copy of O'Neal's bankruptcy petition. (Am. Joint

Stipulations of Fact ¶ 22.) After Hunt moved to compel additional production, O'Neal produced

further documents, namely: complete personal monthly bank statements for the period of May

2007 through June 2009; complete monthly bank statements for CST for the period of May 2007

through June 2009; a copy of the business loan obtained for the business address of CST; and a copy of O'Neal's homeowners insurance policy. (*Id.* ¶¶ 23–24.)

During his Rule 2004 examination, O'Neal stated that there may have been additional documents he had not yet produced that either he or his accountant Malak Everette possessed. (*Id.* ¶ 27.) After the examination, O'Neal tendered a number of additional documents, namely: CST's 2009 annual report; CST's business license; CST's balance sheets for 2006 and 2007; CST's monthly state sales tax returns from January 2006 through July 2009; CST's monthly bills from January 2006 through June 2009; CST's daily sales and cash reports from January 2006 through February 2009 and April 2009; CST's miscellaneous monthly bills; a list of O'Neal's real properties and their purchase prices; O'Neal's property tax information on his three properties from 2006 through 2008; O'Neal's homeowners and renters insurance policies for his three properties; O'Neal's Illinois lottery claim forms; copies of various consignment contracts held by CST; copies of O'Neal's W-2 forms from CST for 2006 through 2008; and copies of CST's cellular phone sales from June 2008 through February 2009. (*Id.* ¶ 28.) O'Neal also amended his Statement of Financial Affairs. (*See* Ex. X.)

## B. Supporting Information O'Neal Did Not Completely Produce to Back up His Reported Inventory, Value, and Income

O'Neal did not produce complete detailed records concerning the number or identity of tenants to whom he leased property, the times at which such properties were leased, the total amounts of rental income he received, and the expenses associated with the rental properties. (*See* Am. Stipulation ¶¶ 22, 24, 28.) However, on O'Neal's personal federal income tax return, he reported $30,000 in rents received for 2006; $24,400 for 2007; and $25,200 for 2008. (*Id.* ¶

17.) With regard to those figures, however, O'Neal testified that he lacked knowledge how the

rental income amounts stated for the year 2008 were arrived at by his accountant who prepared

that tax return. (Ex. V 156:10–13.) Moreover, O'Neal does not possess records from which to

determine how the accountant arrived at the rental income reported on his Statement of Financial

Affairs. (*Id.* at 110:5–111:10.)

O'Neal also did not produce charge slips on credit card debt that related to business

expenses. (*See* Am. Stipulation ¶¶ 22, 24, 28.) During his Rule 2004 examination, O'Neal stated

that he paid part of CST's shortfall in 2008 via credit cards, but could not identify which credit

cards he used to pay the expenses. (Ex. V 160:5–161:23.) At trial, O'Neal said that some credit

card records existed that he had not produced. (Trial Tr. vol. 2, 96:14–18, Mar. 30, 2010.)

O'Neal testified that he did not deposit all of CST's daily gross receipts into the CST

bank account. (Ex. V 195:3–5.) O'Neal did not produce any records showing what percentage of

gross receipts he did deposit (*see* Am. Stipulation ¶¶ 22, 24, 28) and he does not know what that

percentage is (Ex. V 195:6–198:12). He said that he could come up with some figure after talking

to his accountant, but that figure would likely be inaccurate. (*Id.*) O'Neal also testified that he

used the missing deposits to buy new product for the CST inventory, but produced no records

documenting that. (Trial Tr. vol 1, 139:25–141:7, Mar. 29, 2010.)

O'Neal also did not produce records that identify the individual CDs and tapes in CST's

inventory, and he admits that no such records exist. (*See* Am. Stipulation ¶¶ 22, 24, 28; Ex. V

46:18–22, 49:17–20.) However, he did provide a computation of inventory value and the name of

his accountant who computed that value. (Ex. V 57:16–20.)

O'Neal has not produced any records concerning the income generated from CST's

recently installed beautician and barber's booths. (Trial Tr. vol. 1, 84:20–22.) However, he did

disclose on his schedules that he received income from the booth rentals. (Ex. W 22.) O'Neal

testified at trial that he received that income in cash and deposited it in CST's corporate account.

(Trial Tr. vol. 1, 92:17–93:7.)

Lastly, O'Neal did not produce CST's corporate book. (*See* Am. Stipulation ¶¶ 22, 24,

28.) At his Rule 2004 examination, O'Neal said that the corporate book had been misplaced. (Ex.

V 89:17–18.)

### C. Reliability of Information O'Neal Produced

Hunt argues that some testimony of O'Neal's calls into question the reliability of the

information and documents that he produced.

First, O'Neal testified at his Rule 2004 examination that his sales records were sometimes

constructed from memory. (*Id.* at 213:3–6.) He said that he wrote down the amount of all daily

sales made by CST once a month and that his memory was good enough to allow him to write

down every sale that occurred in the store during the course of an entire month. (*Id.* at

213:7–215:2.)

Second, there are some discrepancies between CST's daily sales reports and the actual

cash O'Neal deposited in CST's bank account. The daily sales reports in CST's books show

some deposits that are less than the amount of cash O'Neal actually deposited in the CST bank

account. (*Compare* Ex. M (daily reports) *with* Ex. D (corporate bank statements).) For example,

CST's records show deposits of just $2,400 in July 2008 (Ex. M 10.1–10.5), while CST's bank

statements for that month show deposits of $5,350 (Ex. D 11.1–11.3, 12.3–12.9). But while that

discrepancy illustrates the lack of precision in some of O'Neal's record keeping, it also shows

that rents received were deposited in amounts larger than amounts recorded on CST's records, indicating that the deposits are a reliable record of rents collected.

Third, O'Neal admitted that some details contained in his personal and corporate income tax returns may have been inaccurate. In testimony, O'Neal stated that his accountant Mallack Everett was responsible for preparing O'Neal's personal income tax returns and CST's corporate income tax returns (Trial Tr. vol. 2, 48:10–13) and that Everett compiled the tax returns after O'Neal supplied him with CST's bank records, sales report figures, and expense records (*id.* at 52:21–24). Once the taxes were compiled, relying on his accountant, O'Neal signed the returns. (*Id.* at 55:13–56:3.) O'Neal contends that he did not personally know whether the statements in the reports were fully accurate because he relied on his accountant for preparation of the returns and on CST's employee for compilation of the expenses reported. (*Id.* at 56:11–15.)

Fourth, O'Neal testified at his Rule 2004 examination that he did not recognize thirteen check stubs that allegedly evidenced his income for the six-month period preceding the filing of his bankruptcy. (Ex. V 221:22–222:23.) O'Neal submitted these pay stubs prior to his Rule 2004 examination, and at trial O'Neal acknowledged that they were in fact his pay stubs. (Trial Tr. vol 1, 82:15–19.) While O'Neal testified that the thirteen stubs were used to determine his wages for the six-month period preceding his Bankruptcy Petition, several of those checks were not drawn from CST's corporate account during that time period. (Trial Tr. vol 2, 18:2–21:1.)

## II. ALLEGED FALSE STATEMENTS [COUNT III: TITLE 11 U.S.C. § 727(a)(4)]

### A. O'Neal's First Name

O'Neal filed his bankruptcy petition under the name "Jerone" rather than his legal birth name, "Jerome." (Ex. W 1.) O'Neal additionally did not disclose on his petition any other name

that he had been known by during the six years leading up to his filing. (*Id.*)

At trial, O'Neal testified and swore his oath under the name "J-E-R-O-N-E." (Trial Tr.

vol. 1, 22:20–25.) Further, O'Neal testified that he was raised under the name Jerone (with an

"N"), and that it was not until he was old enough to read his birth certificate that he realized that

his name was in fact Jerome (with an "M"). (*Id.* at 31:25–32:5.) O'Neal has usually gone by the

name Jerone, and his drivers license uses that name. (*Id.* at 33:24–34:3.)

O'Neal also testified, both at trial and at his Rule 2004 examination, that he had not used

any name other than "Jerone." (*Id.* at 27:10–13; Ex. V 6:11–14.) However, O'Neal

acknowledged at trial that he incurred many debts under the name "Jerome" and not the name

"Jerone." (Trial Tr. vol. 1, 35:1–37:10.) Many of the documents O'Neal submitted also show that

he used the name "Jerome" in the past:

- O'Neal's personal income tax returns (Ex. A);

- CST's income tax returns (Ex. B 1.6, 2.2, 3.6, 4.3, 5.5, 6.4)

- W-2 forms that CST issued to O'Neal (Ex. P);

- an SBA Express loan agreement and promissory note for $15,000 (Ex. G 1.1);

- an Apex Mortgage Corporation statement dated February 1, 2007, specifying terms of a
  business loan (*Id.* at 2.1–2.3);

- a 2008 mortgage interest statement from Apex Mortgage (Ex. S 1.1);

- 2008 mortgage interest statements from Wachovia Mortgage, FSB (*Id.* at 2.1–2.2);

- property tax bills for the years 2005 through 2008 for O'Neal's primary residence (*Id.* at
  2.3–2.6);

- property tax bills for the years 2005 through 2008 for O'Neal's rental property (*Id.* at 3.1,

-9-

3.3, 3.5–3.7); and

•       O'Neal's personal bank statements from June 2007 through June 2009 (Ex. C).

While the foregoing showed a childhood history creating a spelling of his name that he
often continued to use, it also slowed a careful use of the correct spelling on most legal
documents. Moreover, there was no evidence that the spelling was used in any way to deceive
bankruptcy creditors or official offices, or that use of that spelling interfered with administration
of the bankruptcy estate.

## B. Rental Income from All Sources

O'Neal's original Statement of Financial Affairs understated the amount of rental income
O'Neal received during the period between 2006 and 2008 by a total of $26,900. On his tax
returns, O'Neal reported rental income from all sources of $30,000, $24,400, and $24,200 for the
years 2006, 2007, and 2008, respectively. (Ex. A 1.4, 3.4, 5.4.) However, on his original
Statement of Financial Affairs, O'Neal disclosed rental income from booth rentals and from one
residential property of only $18,000, $12,700, and $21,000 for those years. (Ex. W 25–26.)
O'Neal later corrected the rental figures in an Amended Statement of Financial Affairs. (Ex. X.)

## C. Income from Booth Rentals

O'Neal could not precisely say how much he received in rental income from the barber
and beautician booths he installed on the CST premises. In his Schedule I, he listed a line item in
the amount of $1,651 that included both the booth leases and his daughter's Social Security
payments. (Ex. W 22.) His daughter's Social Security payments were approximately $450,
leaving $1,201 a month for the booth rentals, a rental amount that O'Neal thought was a little bit
high. (Ex. V 87:17–88:7.) On his original Statement of Financial Affairs, he listed rental income

for 2006, 2007, and 2008 that included both the booth leases and apartment leases. (Ex. W 25.)

At his Rule 2004 examination, O'Neal admitted that he did not know what portion of the income

he listed was attributable to the booth leases, and what was attributable to the apartment leases.

(*See* Ex. V 110:14–23.)

In his schedules, O'Neal treats the booth rentals as his personal income rather than

corporate income of CST. (Ex. W 22, 25.) However, he later testified at trial that he did not

personally collect rental income from booth leases and that the tenants paid CST directly. (Trial

Tr. vol. 1, 9:14–16.) CST's corporate tax returns also show that CST received the rental income.

(Ex. B 1.1, 3.1, 3.5, 5.1, 5.7.)

## D. Gross Receipts

Although O'Neal was the sole shareholder in CST (Am. Stipulation ¶ 13), he did not

disclose any gross receipts of CST in his original Statement of Financial Affairs. (Ex. W 24.) He

did list his own wages from CST of $1,500 per month for 2008, $18,000 for 2007, and $18,000

for 2006. (*Id.*) However, in an Amended Statement of Financial Affairs that O'Neal filed after

his Rule 2004 examination, he also disclosed gross receipts of CST in amounts of $36,459 for

2008, $40,487 for 2007, and $52,273 for 2006. (Ex. X 2.)

## E. Money Received from O'Neal's Girlfriend and Late Mother

O'Neal did not disclose in his original or amended Statement of Financial Affairs money

received in 2006, 2007, and 2008 from his former girlfriend, Gloria Avila, and from his late

mother, Ruth O'Neal. (Am. Stipulation ¶ 6.) During his deposition, O'Neal stated that he was

receiving between $200 and $500 a week in support from the two women. (Trial Tr. vol 2,

44:13–18.) Later, O'Neal testified that the figures he gave during his deposition testimony were

-11-

exaggerations prompted by the contentious relationship between him and opposing counsel. (*Id.* at 44:17–24.)

At trial, O'Neal testified that he did not disclose those payments because he considered them gifts or occasional assistance, not regular income. (*Id.* at 43:11–25.) O'Neal said that he lived with Ruth O'Neal before she died and that she would contribute money to household expenses from her Social Security check when she could. (*Id.* at 54:23–55:6.) He also testified that he probably spent more money on her than she gave to him. (*Id.* at 43:11–25.) With regard to Gloria Avila, O'Neal's former girlfriend, O'Neal contends that rather than giving him money directly, she would occasionally help with his credit card and cell phone bills and would pay for his dinner. (*Id.* at 44:8–12.)

**F. One Lease Not Disclosed on Schedule G**

The instructions on Schedule G provide in relevant part: "Describe all executory contracts of any nature and all unexpired leases of real or personal property. . . . State the nature of debtor's interest in contract. . . . State whether the debtor is the lessor or lessee of a lease. Provide the names and complete mailing addresses of all other parties to each lease or contract described." (Ex. W 20.) However, O'Neal did not disclose on his Schedule G a tenant he had in the apartment at CST's business location. (*See id.*; Trial Tr. vol. 1, 41:5–22.) O'Neal stated that he did not disclose that lease because the tenant is living there on a month-to-month basis. (Trial Tr. vol. 1, 41:17–18.)

**G. Guarantee Not Disclosed on Schedule H**

The instructions on Schedule H provide in relevant part: "Provide the information requested concerning any person or entity . . . that is also liable on any debts listed by the debtor

-12-

in the schedule of creditors. Include all guarantors and cosigners." (Ex. W 21.) O'Neal did not

initially disclose that CST was a guarantor on a loan to him from Apex Mortgage Corporation in

the amount of $97,500. (*Id.*; Ex. G 2.1–2.3.)

## H. Assertedly Undisclosed Transfers

On his Statement of Financial Affairs, O'Neal did not disclose two pre-petition transfers

by him.

First, he did not disclose a transfer to Innovative Bank of a security interest in CST's

deposit accounts. (*See* Ex. W 29; Ex. G 1.1.) However, the Innovative Bank promissory note is

not dated (Ex. G.1.1), and the deposit accounts were CST's property, not that of O'Neal.

Second, O'Neal did not disclose a transfer to Apex Mortgage Corporation of a security

interest in the building housing CST. (*See* Ex. W 29; Ex. G 2.1–2.3.) However, he did disclose

the mortgage on his Schedule D, which lists creditors holding secured claims. (Ex. W 13.)

## I. Identity of O'Neal's Accountant

O'Neal did not disclose in his original Statement of Financial Affairs any individual who

kept or supervised the keeping of books of account and records, any individual or firm who

prepared his financial statements, or the identity of any person who had possession of his books

and records. (Am. Stipulation ¶ 6.) However, O'Neal testified that Malak Everette was his

accountant and that Everette possessed CST's books and records when O'Neal filed his

bankruptcy (Trial Tr. vol. 1, 59:17–23.)

O'Neal additionally did not disclose in his original Statement of Financial Affairs that his

accountant took inventory of CST's merchandise or when those inventories occurred. (Ex. W

34.) However, in his testimony, O'Neal claimed that Everette handled all of his finances and that

Everette in fact did take inventory. (Trial Tr. vol. 2, 47:10–13, 103:17–18.)

Neither party called Everette as a trial witness.

## J. CST's Business Days

At his rule 2004 examination, O'Neal testified that CST was only open Monday through Friday. (Ex. V 210:19–23.) However, CST's daily sales and cash reports show that sales and transactions were made on Saturdays between January 2006 and January 2009. (Ex. M.)

## K. Cash Register Reports

O'Neal tracks CST's daily sales through its cash register. (Ex. V 208:14–16.) He testified at his Rule 2004 examination that the cash register did not produce any reports. (*Id.* at 208:17–23.) At trial, however, O'Neal stated that the register did produce daily reports. (Trial Tr. vol. 2, 7:4–7.)

## L. Value of O'Neal's Interest in CST

O'Neal, the sole shareholder of CST, scheduled the value of his interest in CST as $1,000 in his bankruptcy filing. (Am. Stipulation ¶¶ 8–9, 13.) However, CST's federal income tax returns and CST's balance sheets show that from 2006 through 2008 the corporation booked about $90,000 in inventory and $35,000 in retained earnings and has consistently booked assets totaling more than $142,000. (Ex. B 1.1, 3.1, 5.1; Ex. J 1.1, 2.1; Trial Tr. vol. 2, 68:1–3.) But those same documents also show that CST made very little or no money each year and owed liabilities in excess of $100,000. (Ex. B 1.1, 3.1, 5.1; Ex. J 1.1, 2.1.) They also show that O'Neal consistently valued his stock at $1,000. (Ex. J 1.1, 2.1.) O'Neal did not remember how he determined that his business stock was worth $1,000, but in doing so he relied on his attorneys. (Ex. V 31:15–32:17.)

Apart from showing the book value of CST on paper, Hunt offered no evidence of the actual market value of O'Neal's stock in CST, and therefore failed to prove that the value O'Neal set on it was inaccurate.

## CONCLUSIONS OF LAW

If all statutory requirements are met, an individual Chapter 7 debtor receives a discharge so as to be able to "start afresh with no overhang of debt." *McClellan v. Cantrell*, 217 F.3d 890, 892 (7th Cir. 2000); 11 U.S.C. § 727. A discharge in Chapter 7 is a privilege, not a right, and is for the benefit of honest debtors only. *In re Juzwiak*, 89 F.3d 424, 427 (7th Cir. 1996). If the conditions specified in § 727 are met, the debtor will not receive a discharge. *Id.* Those conditions, however, are construed strictly against creditors and liberally in favor of debtors. *Id.* "The reasons for denial of discharge must be real and substantial rather than technical and conjectural." *Collier on Bankruptcy* ¶ 727.01[4] (Alan N. Resnick & Henry J. Sommer eds., 15th rev. ed., 2010).

Hunt asserts two remaining discharge exceptions. In Count I, she objects under 11 U.S.C. § 727(a)(3) that O'Neal failed to keep or preserve records. In Count III, she objects under 11 U.S.C. § 727(a)(4) that he knowingly and fraudulently made false oaths and accounts.

## I. O'NEAL PRODUCED ADEQUATE RECORDS (COUNT I)

Discharge is denied to a debtor who has "concealed, destroyed, mutilated, falsified, or failed to keep or preserve recorded information, including books, documents, records and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all the circumstances of the case." 11 U.S.C. § 727(a)(3). To avoid denial of discharge under this exception, debtors must provide creditors

-15-

"'with enough information to ascertain the debtor's financial condition and track his financial dealings with substantial completeness and accuracy for a reasonable period past to present.'" *Juzwiak*, 89 F.3d at 427 (*quoting In re Martin*, 141 B.R. 986, 995 (Bankr. N.D. Ill. 1992)). This ensures that trustees and creditors receive sufficient information to enable them to "'trace the debtor's financial history; to ascertain the debtor's financial condition; and to reconstruct the debtor's financial transactions.'" *Id.* at 427–28 (*quoting Martin*, 141 B.R. at 995). Records need not be kept in any particular manner, but they should be complete enough that courts and creditors are not required to speculate as to the financial history or condition of the debtor. *Id.* at 428.

Creditors do not bear the burden to reconstruct a debtor's business affairs or to undertake an independent investigation. *Id.* at 429. It is not enough that a debtor's financial picture be constructed from records "kept in his head." *Id.* Rather, the debtor must supply creditors with dependable written documentation from which oral testimony can be substantiated. *Id.* That documentation must be substantially complete and accurate. *Id.* The creditor need not prove that the debtor had fraudulent intent. *Id.* at 430. The sufficiency of the document record is the relevant issue. *Id.*

A bankruptcy judge has broad discretion to decide whether a debtor's books and records are adequate and whether a debtor's failure to keep records is justified. *In re Costello,* 299 B.R. 882, 897 (Bankr. N.D. Ill. 2003). The adequacy of a particular record is a question of fact that must be decided on a case by case basis. *Id.* Factors relevant to the adequacy of records include "the size, complexity, and nature of the debtor's business; his educational background and level of sophistication; his experience and business acumen; and his personal financial structure." *Id.*

Hunt does not contend that O'Neal concealed, destroyed, or mutilated any records. The issues presented are whether he falsified or failed to keep necessary records and whether the records O'Neal produced are reliable and sufficient to trace the debtor's financial condition. Despite some deficiencies in record keeping, it is clear from the many reliable records supplied that O'Neal disclosed voluminous details as to his failing business and failed real estate interests, and that he did not hide assets or sources of earned income. It must be found and concluded from the evidence that O'Neal has provided records that are quite sufficient to trace his financial history and to document his earnings, assets, and liabilities. He has also offered justifications or explanations for asserted insufficiencies in his record keeping.

## A. Records O'Neal Allegedly Failed to Keep

Hunt asserts that O'Neal's records are lacking in several respects. She first argues that O'Neal failed to produce records showing income from his rental properties. However, his personal income tax filings and bank statements disclose the amounts received from the rental properties. Those and other records are sufficient to determine O'Neal's real estate interests and income. Further details that Hunt seeks about the identities of the tenants, dates of leases, and other historic details would not add materially to O'Neal's financial picture. It has not been contended, and certainly it was not shown that O'Neal hid property or income from the Trustee or his creditors.

Hunt next complains that O'Neal did not produce documentation of his credit card debts used to fund CST expenses. However, O'Neal listed his credit card debts on his bankruptcy schedules. The credit card companies have not challenged the amounts of those debts, and Hunt has not shown that the amounts of those debts and details behind them affect her or other general

-17-

creditors. While a good business manager would keep charge slips to document corporate

expenses, lack of these charge slips here did not prevent review of assets and income in the

bankruptcy estate.

Third, Hunt argues that O'Neal did not produce specific records showing what percentage

of CST's gross receipts O'Neal did not deposit into CST's bank account. It is true that O'Neal

did not produce documents showing or enabling that calculation, but the totality of the

documents that O'Neal did produce must be considered: income tax returns, CST's daily sales

reports, list of expenses, corporate bank statements showing cash deposits, and evidence of

checks cashed at the register. From these documents, a creditor can determine O'Neal's income

and sources of income, whether or not it was all deposited. Moreover, as discussed earlier, some

evidence showed bank deposits larger than recorded receipts.

Fourth, Hunt contends that O'Neal did not produce any record that specifically lists

CST's individual CDs and tapes item by item. However, he did produce a written evaluation of

CST's inventory and the name of the accountant who compiled it. That sufficiently documented

inventory value. Given the speed of technical change in the music business, it is not surprising

that the inventory was valued in bulk and not by the piece. Hunt offered no evidence that the

accountant's valuation was erroneous.

Fifth, Hunt argues that O'Neal did not produce records showing the income generated by

CST's recently installed beautician and barber booths. O'Neal's testified that he deposited the

income into CST's corporate account, so his production of CST's bank records was sufficient

documentation of that income.

Sixth, Hunt points out that O'Neal did not produce CST's corporate book, which might

-18-

show any corporate resolutions and the like. But given the diversity and number of documents produced, O'Neal has provided enough documentation to ascertain his financial history. Moreover, Hunt did not show that O'Neal in fact kept particular documents relevant to his finances in the corporate book.

## B. Reliability of O'Neal's Records

Hunt also criticizes the reliability of O'Neal's records. First, she contends that CST's sales records are inaccurate because he sometimes constructed them from memory. However, Hunt did not show that the sales records were in fact inaccurate. O'Neal testified that the daily cash records are substantially accurate and explained the procedures for handling money in his small business. O'Neal also provided CST's bank statements, which sufficiently show CST's income from all sources.

Second, Hunt points out that O'Neal consistently deposited more cash into CST's corporate bank account each month than were reflected on CST's daily sales records. While Hunt asserts that this demonstrates CST's daily sales records to be inaccurate, O'Neal testified that CST also received rental income for the barber and beautician booths and that the rent was paid in cash. That rental income would not show up on CST's daily sales records, and accounts for the asserted the discrepancy. Moreover, bank deposits larger than sales recorded in a business's books do not show that the deposits were unreliable even though the books recording income were sometimes not complete in detail.

Third, Hunt complains that O'Neal testified that the information in his personal and corporate tax returns may not have been accurate. However, O'Neal had no personal knowledge of the details reported on his tax returns, as he did not prepare them. To him, they may not be

completely accurate because of his reliance on both his accountant for review of income records and on CST's employee for compilation of the expenses. Hunt has produced no evidence to show that O'Neal's tax records were in fact inaccurate.

Fifth, Hunt contends that the contradictions surrounding the thirteen check stubs that supposedly evidence O'Neal's wages cast some doubts as to accuracy of O'Neal's records. However, they did not contradict the big picture of a small businessman who was careless in some regards but who kept and presented overall records that enabled a detailed understanding of his finances.

In a perfect business world, people who start small businesses would get some training in the maintenance of records. Most do not do so, and lack of adequate record keeping has contributed to many failed businesses and judgments blocking discharge in this court. However, one can expect the record keeping of a small business to be less precise than that of other businesses. Given that CST is a small business and given O'Neal's limited business experience, it is not surprising to find some shortcomings in his business and personal records. However, despite the shortcomings as to some details that were established, O'Neal's Trustee and creditors can certainly track his income, expenses, and financial dealings based on totality of the documents produced. Considering the diversity and volume of those documents, O'Neal has provided enough records to allow creditors to examine his financial history, including the extent of his assets and his prior income and expenses. Additionally, the documents that O'Neal has produced are dependable enough to substantiate his oral testimony. The scope and history of his investments, income, and losses are clear to the trustee, the court, and creditors. For purposes of § 727(a)(3), O'Neal's records are sufficiently complete and accurate.

## II. O'NEAL DID NOT MAKE FALSE OATHS OR ACCOUNTS (COUNT III)

Discharge is denied to a debtor who "knowingly and fraudulently, in or in connection

with the case . . . made a false oath or account." 11 U.S.C. § 727(a)(4)(A). This exception

ensures that debtors provide dependable information to those who are interested in the debtor's

bankruptcy estate. *In re Costello*, 299 B.R. 882, 899 (Bankr. N.D. Ill. 2003).

> The purpose of this provision is to ensure that the debtor provides honest
> and reliable information in her bankruptcy case and that the bankruptcy
> trustee has access to all assets and information needed to administer the
> estate effectively. Put another way, the debtor may not play fast and loose
> with the bankruptcy process but must describe fact rather than fiction in
> her disclosures.

Nathalie D. Martin, *Fee Shifting in Bankruptcy: Deterring Frivolous, Fraud-Based Objections to*

*Discharge*, 76 N.C. L. Rev. 97, 121 (1997) (citations omitted).

A debtor's false oath or account "must relate to a material matter before it may bar a

discharge." *In re Agnew*, 818 F.2d 1284, 1290 (7th Cir. 1987). Additionally, the debtor must

have known that the statement was false (or at least recklessly disregarded whether it was true or

false) and that the statement would create an erroneous impression as to some material aspect of

his finances. *See In re Chavin*, 150 F.3d 726, 728 (7th Cir. 1998). Thus, an objecting creditor

must show that:

1. the debtor made a statement under oath;

2. the statement was false;

3. the debtor knew that the statement was false (or recklessly disregarded whether it
   was true or false);

4. the debtor made the statement with the intent to defraud; and

5.   the statement related to the bankruptcy case in a material way.

*Costello*, 299 B.R. at 899; *see Chavin*, 150 F.3d at 728.

Statements under oath to be considered include a debtor's bankruptcy schedules, statements of financial affairs, and any deposition and trial testimony. *Costello*, 299 B.R. at 899. A statement is material if it relates to the debtor's estate, involves the discovery of assets, concerns the disposition of the debtor's property, or otherwise relates to his entitlement to discharge. *Id.* at 900.

Debtors may not excuse intentionally false oaths by making subsequent corrections or amendments to their original bankruptcy petition. *Id.* at 899–900. Allowing a debtor to submit a wilfully false schedule, and then on discovery, avoid negative consequences of his dishonesty by amending those schedules, is contrary to purposes of the law. *Id.* Because operation of the bankruptcy system runs on honest reporting, if debtors could knowingly omit assets at will, with the only penalty being that they have to refile amendments once caught, cheating would be altogether too attractive. *Id.*

O'Neal has not made material false oaths that warrant denial of his discharge. Hunt complains of twelve asserted false oaths, but each of the misstatements involved was minor, immaterial, and later corrected if necessary. None were shown to hide income sources, assets, or the disposition of assets, or to have been made with fraudulent intent.

The first misstatement Hunt identifies is the discrepancy between O'Neal's use of "Jerone" and "Jerome." It is true that O'Neal failed to list his birth name "Jerome" in his schedules as a name he often used. His use of that name on numerous official documents shows that he was aware that "Jerome" was his birth name, and he admitted as much at trial. However,

-22-

the discrepancy has little material effect on O'Neal's bankruptcy case as it does not bear on Hunt's discovery of O'Neal's assets or his income, or the disposition of O'Neal's estate. Based on O'Neal's testimony as to a long life of using a name slightly different from his birth name, it cannot be said that the difference in names was a ploy with intent to defraud the court or his creditors or with reckless disregard as to whether they would be misled. There was in fact no evidence offered to show that O'Neal ever used the name "Jerone" to deceive or with fraudulent intent.

O'Neal's second asserted misstatement is his initial under-reporting of rental income on his original Statement of Financial Affairs. However, Hunt did not show that O'Neal did so with intent to defraud, or with reckless disregard of truth. O'Neal explained the initial discrepancy by testimony that he had originally deducted expenses before stating the income amounts. He was not recklessly indifferent to truth in stating the amounts he thereby listed on the Statement of Financial Affairs. Moreover, the larger figures reported on his tax returns were quickly revealed, and there was no showing by Hunt that any part of that income was kept and hidden from the estate.

The third misstatement that Hunt complains of is O'Neal's claim on the Statement of Financial Affairs that the income from the booth rentals was his personal income. However, Hunt did not show that O'Neal made this claim with the intent to defraud or with reckless indifference to its truth. He was the sole shareholder of CST and did not always recognize the formal corporate form. It is understandable that someone in O'Neal's position might not know exactly whether the income was his or that of the corporation. This does not show intent to defraud or reckless indifference.

The fourth misstatement Hunt points to is O'Neal's failure to disclose CST's gross receipts as income on the Statement of Financial Affairs. This ignores the fact that those gross receipts were income to CST, not O'Neal. It was not at all clear that he was required to list the gross CST receipts on his personal Statement of Financial Affairs, and therefore there was no falsely omitted information that could properly be viewed as a false statement under oath.

O'Neal's fifth asserted misstatement is the omission from his Statement of Financial Affairs of money he received from his girlfriend and money. However, O'Neal explained that he did not schedule these amounts as income because he considered them gifts and because they were not regular payments. This explanation was perfectly plausible, and shows that O'Neal lacked the intent to defraud and was not recklessly indifferent in omitting the payments.

Hunt identifies O'Neal's omission of a tenant from Schedule G as the sixth asserted false oath. However, O'Neal testified that the tenant was on a month-to-month lease, and therefore there was nothing to disclose on Schedule G. Whether that is legally correct or not, it was a plausible explanation showing that O'Neal lacked intent to defraud and was not recklessly indifferent.

The seventh asserted misstatement is O'Neal's failure to disclose on his bankruptcy Schedule H that CST was a codebtor on O'Neal's mortgage of the building housing CST. O'Neal should have disclosed that CST was a guarantor or coborrower, but this omission did not have the effect of hiding assets, and Hunt did not show that O'Neal had intent to defraud or that he was recklessly indifferent in this omission.

O'Neal's eighth asserted misstatement is his omission of two property transfers from the Statement of Financial Affairs. Specifically, Hunt complains that O'Neal did not disclose a

-24-

transfer of (1) a security interest in CST's deposit accounts to Innovative Bank and (2) a mortgage in the building housing CST to Apex Mortgage Corporation. The deposit accounts were property of CST, not O'Neal, so it is doubtful that O'Neal did have to disclose the transfers on his Statement of Financial Affairs. While O'Neal should have disclosed the mortgage on that statement, he did disclose it on Schedule A, his schedule of real property, and on Schedule D, his schedule of secured creditors. It therefore was not established that O'Neal intended to defraud his creditors or was recklessly indifferent in connection with these matters.

Ninth, Hunt argues that O'Neal's failure to identify his accountant on the Statement of Financial Affairs was a false oath. O'Neal's failure to disclose that his accountant possessed CST's records and had prepared CST's inventory did not hide assets or hamper Hunt's ability to discover assets, because he readily identified the accountant when asked. In context of the mass of information and documents that O'Neal supplied, Hunt did not thereby show that O'Neal intended to defraud his creditors or was recklessly indifferent to misleading them.

The tenth asserted misstatement Hunt complains of is O'Neal's statement that CST was open Monday through Friday even though CST's sales records show sales on Saturdays. This has no relation whatsoever to discovery of assets or disclosure of estate property. O'Neal disclosed through sales records the more expanded days of operation. O'Neal's creditors would derive no further useful benefit from knowing whether CST was open five, six, or even seven days a week. Therefore, this misstatement was not material and cannot qualify as a false oath.

Hunt identifies as O'Neal's eleventh asserted misstatement his testimony at the Rule 2004 examination that CST's cash register did not produce daily sales reports. O'Neal later acknowledged at trial that in fact the register did produce daily reports, but that he had not

produced them. Daily register reports might in some cases be helpful to a creditor seeking to trace income, so O'Neal's contradictory statements might have been material. However, Hunt has not shown that O'Neal intended to mislead creditors by these statements or that he thereby hid income or assets that in fact were disclosed in his bank deposit records that were produced.

The last of O'Neal's asserted misstatements is valuation of CST common stock at $1,000. Hunt suggests the actual value is much higher, relying on asset valuations in CST's corporate income tax returns and balance sheets. However, the asset valuations in those documents are not themselves enough to value O'Neal's corporate shares. Hunt failed to take into account CST's liabilities or cash flow. Moreover, those same documents show that O'Neal consistently valued his stock in CST at $1,000. Hunt again did not show intent to defraud or reckless indifference, and she certainly did not present evidence to show that the actual market value of O'Neal's stock exceeds $1,000.

O'Neal's discharge should not be denied. In her pursuit of a right to collect on her judgment, a debt which she has not contested as nondischargeable, Hunt has gone through every bit of information that O'Neal produced with a fine-tooth comb in an attempt to find enough errors to except O'Neal's debt from discharge. It was her right to do so. However, it is also clear that O'Neal has relied heavily on his accountant, employees, and lawyers throughout his business life and bankruptcy. While some of his errors might arguably have been material under other circumstances, Hunt did not show that O'Neal made any with an intent to defraud or deceive creditors or hide assets, or that any did in fact hide assets or income.

Generally, O'Neal's errors lack the materiality and intent to defraud necessary to deny him of his stay under § 727(a)(4)(A). Examining every arguable error a debtor makes in his

-26-

business and throughout the bankruptcy process does not necessarily establish a cause to bar the

debtor from discharge under § 727(a)(4) even when there are many minor errors. Defending

against such attacks creates a burden that would be hard for any small businessman of limited

means to meet. A bankruptcy proceeding is not the same as an I.R.S. audit, where every mistake

has a dollar consequence.

Indeed, this debtor, for all his possible mistakes, has shown a strong and serious effort to

keep records and reveal facts and documents from which his financial circumstances and

business transactions may be ascertained. His records and accountings are much more thorough

than those of many other debtors seen in this court over the years. As noted by the comment out

of *Collier on Bankruptcy* reported earlier, reasons for the drastic remedy of denying discharge

must be "real and substantial rather than technical and conjectural." For many reasons discussed

above, this is not a case where discharge should be denied under § 727(a)(4)(A).

## CONCLUSION

For reasons discussed above, judgment will separately enter in favor of O'Neal and

dismissing the remaining Counts I and III.

ENTER:

Jack B. Schmetterer
United States Bankruptcy Judge

Dated this ____ day of August, 2010.

-27-